Okay, Mr. Samuel. All right. May it please the Court. My name is Leob Samuel on behalf of Appellants Hetero Labs, Hetero Labs Unit 3, and Canberra Pharmaceuticals. I'm sorry. The timer hasn't started. Oh. Oh, yeah. The timer is on.                   The timer hasn't started. It'll get fixed. Go ahead. Oh, okay. We've reserved four minutes for rebuttal. This appeal arises from a preliminary injunction improperly enjoining appellants from launching the generic drug. The central issue is claim construction. The claim is directed to a method of treating a neurological disorder. It requires two compounds, dexamethorphan and quinidine, to be administered in a specified weight-to-weight ratio of 1 to 0.5 or less. The question is, Your Honor, how to calculate that ratio. Our construction is simple. The ratio compares the weight of dexamethorphan to the weight of quinidine as compounds, not the weight of their salts. How do you know that from the specification? So the specification teaches us in two instances. First, the specification talks about how... I should say, how do you know that from the claim also? Okay. I mean, my question is, I mean, it doesn't say, you know, the effective dosage, the effective ratio, and the specification uses, it has some language in it that suggests that when it uses those terms, that it's referring to the salt forms as well. Okay. So let's start with the claims, Your Honor. The claims actually support our construction, and the claims recite dexamethorphan and quinidine as compounds in a specified weight-to-weight ratio. This claim is agnostic as to the delivery form and imposes no limitation as to the form of delivery. And when the inventors intended to claim salts, they did so specified clearly in the dependent claims themselves. Why wouldn't I understand that to mean that it's including, that these phrases, dexamethorphan and quinidine, includes the salt forms when the dependent claims refer to the salt forms? So that's going into the specification now, Your Honor. Do you want to finish off on the claims, or should we jump into the specifications? No, I was talking about the dependent claims. The dependent claims are not saying dexamethorphan includes dexamethorphan hydrobromide. They're saying that they are administered in a pharmaceutically acceptable salt. That's not an invitation or an authorization to change the meaning of dexamethorphan and quinidine in the claimed ratio itself. Claim one is agnostic as to the delivery form itself. That doesn't change irrespective of, and it doesn't matter what the type of delivery form itself is. But if you're saying that claim one is agnostic, that sounds like you're saying that claim one includes the salt forms as well as the free base form of dexamethorphan and quinidine. Correct? Yes. It does include any kind of form. However, Your Honor. The claimed ratio requires you to limit yourself to the active ingredient. Exactly, Your Honor. Which means that you're reading the term dexamethorphan at the beginning of claim one, for example, in a way that sounds like it's inconsistent with the meaning of the term at the end of the claim where you get to the ratio. No, Your Honor. But you just told me, I think, a moment ago that in claim one, dexamethorphan includes the salt forms. No, that's not what I meant.  I thought that's what you said. That claim one includes all kinds of forms. However, the term... Including salts. If I may. The dexamethorphan term in claim one, whether it's used in the range or whether it's used in the ratio, we're referring to the compounds. However, the claim itself can be administered in any... The drug itself can be administered in any kind of form. So the ratio itself... And that goes to the... Now we can go to the specification. So by including it in the salt, using a salt carrier doesn't exclude it from the coverage of the claim, but the reference is still to the active ingredient. Exactly, Your Honor. And that's what the specification teaches. The specification, in fact, talks about how dexamethorphan and quinidine, they're well-known compounds. In fact, APPX55 shows the picture of dexamethorphan. APPX57 shows the picture of quinidine. These are well-known compounds. They were known by name and structure. And the patent explains quinidine's purpose and the purpose of this invention. It's to increase the dexamethorphan blood level and to yield more consistent and predictable results of dexamethorphan in the blood. In several places in your patent, I mean, sorry, in your briefing, you say the patent makes clear that the ratio in the claim is referring to what I'm going to say is base form ratio. Does that make sense to you? I don't have a... In other words, that it's the non-salt form for the ratio. Yes, Your Honor. It's called free base. And you cite column 17 through column 18 for that position. I think you know where I'm referring to. I'm having a hard time seeing it as somebody who maybe doesn't have the technical background. And let me tell you some of the reasons why. I just want to see what your response is. I mean, in this, it's giving amounts both for the salt form and then for the free base form. And then it talks about an effective dosage when it's talking about the free base form. But the claim doesn't say anything about an effective dosage. I mean, couldn't you have said effective dosage if that's what you meant? Well, that's Asuka's argument, but it's a misplaced argument, Your Honor, because that's essentially trying to suggest that the word dextromethorphan has different meaning otherwise. This is the plain and ordinary meaning of dextromethorphan is the well-known compounds shown in the specifications. Nothing in the intrinsic record that suggests omitting that phrase converts that claim ratio into a salt-based measurement. And, Your Honor, if we go to... Well, it wouldn't make any sense, would it? Because the salt isn't... It's not therapeutic. It's just a carrier for the active ingredient. Exactly, Your Honor. And that's the whole point. And if you look at the prosecution history, distinguishing the Smith patent, there's some fine lines being drawn here between 1 to 0.5 and 1 to 0.75 and saying, no, this wasn't anticipated by the Smith patent, which has the same specification, because we're using a different amount of ratio of active ingredients. Exactly, Your Honor. Can I go back to my question about column 17 and 18? When I look at the amounts, there's a couple examples that show that the salt forms result in, I think, the proper ratio, but the corresponding effective dosage forms do not have the correct ratio in the claim, or they don't have the ratio in the claim. I'll give you... Like, for example, in column 18, line 6, it says 60 milligrams of dextromethorphaned... Dextromethorphaned hydrobromide and 30 quinidine sulfate. So that would be falling within the ratio of the claim. But when I look at what... None of the corresponding effective dosages fall within the ratio of the claim. So I am having a hard time seeing why I should read the claim in light of the specification to require that it be effective dosage as opposed to salt form dosage. So there's two points to that issue. Point number one is, if you look anywhere in the specification, you're not going to find the claimed ranges and the claimed ratio disclosed in the specification. You really kind of figure that out later after the fact. Well, that's assuming that the claimed dosage and ratio is not for the salt form, right? Regardless of whether it's referred to as effective dose or not. It's just not disclosed in there. There's a range in the claim, right? But it's not in the specification. Okay. The second point as to determining that ratio, because that's where the patent teaches that when you use that salt, you convert. That's a really critical point that really Otsuka doesn't reconcile with that issue. Why would you even disclose this if you're not going to convert? If your ratio is based on salt form, what's the purpose of this language? Why is it being used? What does it serve? It doesn't answer that question. But the way to convert, for example, a good example is the 30 milligrams of dexamethorphine hydrobromide converts to 22 milligrams. It's roughly 83%. It converts to 22 milligrams of dexamethorphine. That's what a person would use in that ratio. Why? Because that's how you can get the consistent and predictable blood levels of dexamethorphine in the blood. That's how you know what you're putting into the human body. It's not some salt form in which some salts might have a higher weight and you don't have as much dexamethorphine. That's why it's important. Going into the prosecution history, Judge Dyke, you were right. The examiner understood the inventor's intent here. The examiner mapped the compound-based ratio. It's a compound-based prior reference method. There was no discussion at all or disclosure of a pharmaceutically acceptable salt. When salt was at issue... The discovery here was the amount of quinidine in the ratio, right? The idea was that you could reduce the amount of quinidine in the ratio from Smith-Patton that was 0.75 or whatever it was to 0.50, right? Correct. The whole focus was on the amount of active ingredient. Correct, Your Honor. You can see that conversion play out also in the original claims that were filed. Original Claim 1, the claims that were originally filed show the intention of the use of the term dexamethorphine to mean the compounds. Original Claim 1 capped quinidine at 50 mg, while Original Dependent Claim 9 capped it at 60 mg. Now, you can't have a dependent that has a weight range greater than the independent. That would improperly expand, not narrow, the scope of the dependent claim. So the only way those claims can be reconciled is if quinidine sulfate, the weight of that quinidine sulfate, is converted using that conversion table to quinidine and determine the equivalent amount. You're talking about cancelled Claim 9? Correct, Your Honor. Which doesn't appear in the current patent. Correct, but it still shows the intent of the inventors and the inventors haven't changed that in any way throughout the prosecution history, that intent. I would just like to jump to, Your Honors, the reasons for why Otsuka's construction is wrong. Otsuka's construction wants you to look to the infringing product. That's what they're saying as the metric to determine this claim scope. Claims, as Judge Stoll, you mentioned in the first hearing, that's not how you determine claim scope by the accused product. Second point is Otsuka misapplies the doctrine of claim differentiation. The focus of the claim is not on the delivery form, it's on the compound ratio and it does not matter delivery form. Claim 1 is agnostic and the claim structure itself does not redefine the meaning of dexamethorphine and quinidine. Finally, I want to point to, Your Honors, the fact that if we are to construe the same way that Otsuka's construction based on salt is, that would render the claim indefinite. In fact, the district court made no findings on indefiniteness and had it made a finding on indefiniteness, it would have realized that if you apply the salt, if you apply that ratio, it would mean it could be the compound or the salt. And that would yield materially different results with different outcomes, no metric whatsoever for a person's skill in the art to determine what's the scope of the patents. In fact, that falls squarely in the four corners of Teva v. Sandler, where we had the claims were deemed indefinite because the term molecular weight could be calculated in three different ways, each yielding three different results, and the patent did not specify which one to use. Now, would you agree that where the patent specification uses the word DM, the abbreviation DM, and the abbreviation Q, that that refers to either DM, dextromethanol, orphen, or, in the case of quinanone, quinanone or their salts? Regardless of how it's being used, Your Honor, for purposes of the ratio, it's still going to have to be the weight of the compounds. Patents, I think you will agree with me, often uses DM and Q not to be limited just to the dextromethanol. So, in some instances, Your Honor, there may be some shorthand as trying to refer to the product that's being used, that's being administered. That being said, when it came down to the application of that ratio, the intent of the inventors was clear, whether it's in the original claims, whether it's in response to the examiner, it's the ratio is based on the compounds, Your Honor. I'd like to reserve a few more minutes left. Well, we'll give you two minutes, Your Honor. Thank you, Your Honor. Okay. Good morning and may it please the Court. Appellant. So, I'm having trouble understanding how your claim construction makes any sense in terms of this patent. You've got these two active ingredients. You had an earlier Smith patent, which covered various ratios of the active ingredients. And in the prosecution history, you distinguish this ratio as being different in providing benefits because of the lower amount of clonidine. The whole focus is on the active ingredient. Why in heaven's name would it make sense to measure the ratio in terms of the product with the salt carrier, which is not an active ingredient? Your Honor, the claims are focused on the administration, the focus on what is being administered. The word administered is used three times in Claim 1. I think you're responding to my point. The concern here is with the amount of active ingredient, not with whether it includes a salt form or not. Why does it make any sense to say that once it's administered in a salt form, that the ratio of active ingredient is somehow thrown out the window? The patent is not about blood levels. The claims are not about blood levels. The claims are focused on what is actually being administered to the patient, what is being put into the patient's mouth. That's the whole focus here. Yes, there is disclosure and discussion of blood levels, but there is no mention of blood levels, of AUC. What was the invention here? What was the 1 to 0.5 ratio? What was the invention? The invention was that you will have a lower dose of quinidine, which was beneficial, right? The original work by Smith used 150 milligrams of quinidine. No, you're not answering my question. This patent that we're talking about here, the invention was being able to reduce the quinidine so that it's 1 to 0.5 of quinidine, right? And that was thought to have beneficial effects. That it was surprising that a much lower, a submaximally inhibiting dose of quinidine could still allow for the treatment of pseudobulbar. Right, and so why does it make any sense to say that the ratio varies depending on whether it's administered in salt form or a base form? That is what the claim requires. The claim is discussing what is being administered to the patient. And that is... The way that that construction is... So the amount of active ingredient varies under the claim depending on whether it's administered in a salt form or a base form? The active ingredient is the dexamethorphan hydrobromide or the dexamethorphan quinidine. If you look to the label that Hetero submitted to the FDA, it states explicitly that the active ingredient is 20 milligrams dexamethorphan hydrobromide and 10 milligrams quinidine sulfate. So here the focus is on what is being administered. You mentioned the labeling. But in FDA labeling under the FDA salt policy, you describe the active ingredient, right? That's the way the labels are done. Are you familiar with the salt? I was answering your question, Your Honor. You asked me what the active ingredient is. Well, you talked about the labeling. I'm saying to you that FDA labeling requires that you specify the active ingredient even if it's administered together with salt. So that is what Hetero's label discloses to the world that is being administered in each pill. Is that in the appendix? Yes, Your Honor. That is... Maybe page 1374. 13 of our other red brief. It is on page 12 of the red brief. It's ATPX481. That states that it contains dexamethorphan hydrobromide 20 milligrams and quinidine sulfate 10 milligrams. Which page of the red brief is the label, Your Honor? Page 12. That was the location from the label. In the description of the label at ATPX494, it goes on to say... You're looking at 481 and 494? In 494, under the description, section 11 of the label, dexamethorphan hydrobromide is a pharmaceutically active ingredient of dexamethorphan hydrobromide and quinidine sulfate capsules. With respect to Your Honor's initial question about how it could contain... How Claim 1 could be focused on salt, based on the principles of claim differentiation, it has to... If you go down to Dependent Claim 9, for example... Under your construction, if it's administered in the base form,  there's one ratio of the active ingredient. If it's administered in the salt form, there's a different ratio. If someone were to choose to administer, to actually administer in a free base form, you would choose the amount of free base form. If one were to choose to administer... So that the ratio of active ingredient varies under the claim, depending on whether it's administered in the free base form or salt. Those would be different products, but yes. If you administered a different product, you would have a different calculation. How does that make any sense? They're different products, Your Honor. You look to what is actually being administered. The focus remains on the material that is being put into the pill. If Hetero were to put a different material into its pill, there could be a different calculation. But what they put into their pill was 10 mg dexamethorphan hydrobromide and 10 mg quinidine sulfate. So there's no issue of ambiguity in the claim. The claim is focused on the material being administered. If you go down to dependent claim 9... Why isn't it equally consistent with the language that it's referring to the active ingredient? What language are you referring to, Your Honor? The language of the claim. The language of the claim states that the amount of dexamethorphan administered comprises 20 mg to 80 mg per day and the amount of quinidine administered comprises 10 mg to less than 30 mg. Why isn't it saying you calculate the amount of the active ingredient administered whether it's the pre-based form or the salt form and it's the same amount of active ingredient in each case? No, Your Honor. This is saying that you use the amount of what's actually being administered. The keyword here is administered in comparison to the language that's used in the specification describing the calculation, a corresponding effective dose. It does not say corresponding effective dose. It says administered. And if you go down to claim 9, the method of claim 1 wherein about 20 mg quinidine sulfate is administered, the 20 mg quinidine sulfate, the antecedent basis for the quinidine sulfate is the quinidine in claim 1. And in the portion of the specification that I believe my friend was referring to, which is... Do you agree that administering it with a salt doesn't change the therapy, that the active ingredient is the same amount whether it's administered in the salt form or pre-based form? If you're going to... Are you asking about what the corresponding level is? The therapeutic effect is the same whether you administer a particular quantity in the pre-based form or you administer that same quantity together with the salt. I believe the therapeutic efficacy here is determined based upon the dose being administered. That was one of the main focus of the district court finding. My question is the therapeutic effect is the same whether you administer it in pre-based form or together with the salt, correct? I believe what you're saying is accurate. If you have 10 mg of quinidine administered in pre-based form or 10 mg administered together with the salt, the therapeutic effect of those two is the same, right? If you're talking about blood levels, Your Honor, I believe they would produce the same blood levels. But that is not what the claim is referring to. This is a claim about what is being administered to the patient and the specification... The claims, the specification, the prosecution history confirm that. And we have not seen any lexicography or clear and unambiguous avowal that would exclude salts from the words dexamethorphine and quinidine in Claim 1. In fact, the other claims necessarily would... Sorry, the words dexamethorphine and quinidine in Claim 1 necessarily are broad enough to include salts based on the dependent claims and the specification which states that for each embodiment, the quinidine includes quinidine sulfate and the dexamethorphine includes dexamethorphine hydrobromide. That's the red brief citing to the specification at APPX 52 and 53. Similarly, the portion of the specification that my friend cited at APPX 59, columns 17 to 18, makes it clear that there is a distinction between what is administered and a corresponding calculated effective dosage. That portion of the specification states 30 milligrams of dexamethorphine hydrobromide and 30 milligrams of quinidine sulfate may be administered, the word that's in the claims, and then PREN, corresponding to an effective dosage. Those words do not appear in the claims of approximately 22 milligrams dexamethorphine and 25 milligrams quinidine. And the last portion of the intrinsic evidence is the prosecution history. In an office action, the examiner characterized the then-pending Claim 1. That claim appears at Appendix 955, and like the issued Claim 1, it uses the terms dexamethorphine and quinidine. On Appendix 973, the examiner explained that the claims cover the administration of dexamethorphine or dexamethorphine hydrobromide in combination with quinidine or quinidine sulfate. So the prosecution history actually supports Apelli's construction. In the prosecution history, you're trying to distinguish Smith, which included at least a ratio of active ingredient of 1 to 0.75, right? I don't believe Smith went down that low. It was using more than twice as much quinidine as dexamethorphine. Well, that's what the examiner said. As I said, the Smith was a... Okay, but both the Smith patent and this patent, their concern was the ratio of the active ingredients, right? The Smith patent was an initial patent about the treatment of pseudobulbar effect that used maximally inhibiting amounts of quinidine. Essentially enough quinidine to knock out all of the 2D6 in a patient's body. The invention here was that something that was non-maximally inhibiting amount of quinidine, a very low amount in the range of 10 to 30 milligrams, which is what's claimed, would be sufficient to allow for a therapeutic amount of dexamethorphine. That's the context of the invention. The claims themselves, however, are focused on what is being administered to the patient. They are not about blood levels or about any other parameters. So if we concluded that it's about the ratio was designed to achieve a certain blood level, then your construction would be wrong? No, Your Honor, I don't believe the claim has anything to do with blood levels. No, no, no. You're not answering my hypothetical. If we were to conclude that the claim is concerned with blood levels and that the ratio is designed to allow you to reduce the amount of quinidine in your blood, if that were the purpose, then your construction would be wrong, right? That's not the claim, and I also don't believe you have to look at the actual amount. Answer my hypothetical, please. If that were the focus of the claim, your construction would be wrong. Are you changing the amounts of dexamethorphine and quinidine in the claim as well? Or is it just the ratio? If you were concerned with the amount in the blood, then your construction would be wrong, and you should focus only on the amount of the ratio of the active ingredients, correct? I know, Your Honor, I don't know what the difference in the blood levels would be, but the claims have amounts of dexamethorphine and quinidine as well as the ratio. You're not answering my question. My question is, if the purpose of the ratio is to affect the blood levels, if that's the purpose of the claim, then your construction is wrong because it takes account of something which doesn't affect the blood levels, that is, the salt content. If the ratio was, what was, if you're saying the ratio is solely focused on blood levels, which it does not say, then I don't, I still don't believe our construction would be incorrect. Well, there's going to be slightly different ratios. Very slightly different, Your Honor. If you have salt, as opposed to if you don't have salt. If you do the math, you wind up with very, with very slightly different ratios if you are calculating something and not using what's actually being administered. Well, if you're administering with salt, you get one result of blood levels. If you administer it in freebase form, you get a slightly different level of blood level, right? Are you talking about two separate products, Your Honor? Yeah, sure. Two separate administrations. Two separate products. Two separate patients. You could change, you could change two different salts, two different administrations. Right, okay. You could change the amount of anything you want, Your Honor, and you could create different ratios. The question then would be, how, taking a look at Smith, how close would you get if you did the math for the salt form of dextromethorphan and quinidine and versus the blood level in the case of, versus the freebase one. How close would the salt, the two salts get you? The difference is, the difference between salts, if you're doing a calculation of an effective dosage from a salt, the differences are very small,  I have not calculated them for anything in Smith. It may be very small, but under your salt calculation approach, it would come within the prior art in terms of the percentage of active ingredients, right? I don't believe so, Your Honor. No. This is the 1.75, I think, that Judge Dike is referring to. Right, I believe that, though, if the ratio, you also have to look at the amounts of the dextromethorphan and quinidine that are in Claim 1. Not just the ratio, I don't believe there's, yeah, we would not get anywhere near Smith if you did the calculations based on the numbers there, but also you have to look at the amounts that are actually in the claim, including the 10 to 30 milligrams of quinidine.  to the ratio in Smith that the examiner referred to? You're not going to get close to the 1 to 0.5 if you were to... The examiner said the ratio in Smith is 1 to 0.75 or lower. I do not believe that you would get anything close to the same ratio or have the same amounts of the dextromethorphan and quinidine that are... Well, you can do the math, but my math is that using the salt forms you get pretty close to the prior art. It's at least almost 1 to 0.75. Again, I have not done any calculations based on Smith, but it does not meet the requirements of the claim. That's why it was allowed during prosecution. There is no clear non-impervious disavowal of the salts from the scope of dextromethorphan and quinidine in Claim 1, which is focused on administration, not effective dosage. When the patent specification uses DM and Q, is it your understanding that those terms are used to include the salt form? Absolutely, Your Honor. Or to be exclusively the salt form and never refer to the freebase form? Or to be agnostic between the two? The patent uses dextromethorphan and quinidine sometimes to refer to salt and sometimes to refer to the freebase form. And the shorthand DM and Q, would that be used sometimes to refer to one and sometimes the other? Or would it be used consistently? No. That is actually our point. It's used both in a context-dependent manner. That's why in Claim 1, it is broad enough to include both. So, for example, in clinical... When I say DM, I'm actually talking about the initials. The letters. I agree with you, Your Honor. Because that shows up at various points. Yes, Your Honor. When it's used, for example, to refer to a blood level of dextromethorphan, that will be the freebase. When it's used in, for example, Clinical Study 3, which is on APPX 63, which talks about what's being administered, which, again, is what Claim 1 covers. Is the hydro... Is the hydrobermine and the sulfate. Exactly right, Your Honor. So it is used... It can be used in a context-dependent manner to mean either the freebase form or the sulf form. And that is actually... That is explicitly our point. And for the focus, you know what you're using for Claim 1 because the focus is on what is being administered. If you were to use the sulf form, you calculate the ratio with what's administered, the sulf form. If you were to use a different product, a hypothetical product that used the freebase form and that was what was administered, then you would calculate the ratio with the freebase form. You do not calculate... You do not do any type of math conversion of the sulf form to the freebase form when you go from the administration in the beginning of Claim 1 to the ratio at the end of Claim 1. Okay. But in FDA labeling, it's common, is it not, with a product which is administered in the sulf form to be labeled according to the amount of active ingredient? The product that's administered in the sulf form... It's labeled in the sulf form     in terms of the amount of active ingredient. Yes, Your Honor. Is that the case with your client's label? The product uses the sulf form and that is specified as the active ingredient. That is the active ingredient, Your Honor. No, but... In your product, the way it's labeled in actual practice, it refers... When it says quinidine, it gives the amount of active ingredient, right? Yes, Your Honor.        Yes. The product uses dexamethylamide and hydrobromide and it's labeled in terms of the amount of dexamethylamide and hydrobromide. So, it seems to me that there may be a disconnect here. You're using the term active ingredient to include the salt. I think what Judge Dyke's question was is... His premise,  is that active ingredient includes only the free base form of the two compounds. So, given that question, does the label, your label, include the salt or does it exclusively refer to the free base form of the two compounds? In... I'm sorry, I may be misunderstanding. In the weight. So, when it says dex... 20 milligrams dexamethylamide and hydrobromide, that is the weight of dexamethylamide and hydrobromide. Of the salt. Yes, Your Honor. Which is what you're calling the active ingredient. And the label refers to as the active ingredient. That is what's administered. All right. I think we understand. Is that in the appendix? Is that in the appendix? The entire label is in the appendix. Your Honor, is that... Is your question... And... So... Yes. It might be helpful to point out... Yes. How the label is referring to the salt form. Sure. There's the question of the claim construction which is not... You do not look at the label form. I just thought that we were talking about this so it might be helpful. Yes, you're right. That's the second half. Once you have the claim construction then we go to infringement and then for the infringement... I'm not trying to... I understand. I'm just helping you answer a question.  Thank you, Your Honor. The label... The label appears and this is Hetero's proposed... The label for Hetero's proposed product. It appears at appendix 481. It spans a few pages but... I was thinking about your label. Oh. Okay. They are... The differences between the labels are that Otsuka's label uses the brand name New Dexta where Hetero's label uses the words dexamethorphine and quinidine instead of New Dexta otherwise they are substantively the same. This is 481? Yes, Your Honor.  The description of the product is at 494. It should be the next page, Your Honor. The entire label does not appear. It's the front page and the portion that we were discussing, the description. Okay. I think we're out of time. Let's get to the questions. Thank you, Your Honor. Mr. Otsuka, two minutes. Thank you. I want to start by addressing the comment that counsel made. He said, if Hetero puts something in a different pill, it would be a different calculation. That means we can't really know what the claim is covered. Again, it goes back to the infringing product is how you determine a patent. That's not how you determine patent scope. And I want to go to your question, Judge Dyke. When a quinidine of 20 mg freebase is put in the human body and a quinidine sulfate is put in a human body, the quinidine sulfate will have less concentration of quinidine. In fact, quinidine sulfate has 83% quinidine. And so, yes, you're going to have a different ratio and different calculation when you're using salt versus freebase. And in fact, and I'm not trying to... This is not an eye exam. I'm referring to APPX 644,  If you can see, there's green and red at 644. The ones in green would be deemed, under the calculations, would be considered non-infringing. And if you do the... And the ones in red would be infringing. And so there is no way to determine the scope of the patent just simply the way that Otsuka is proposing to construe. Their argument is that the patent's not concerned with blood levels. Of course it is. That's exactly what it's saying. That's what it's trying to treat the neurological disorder. Yes, they're administering salt or any...  they're suggesting a whole slew of forms of administration. Each one has a different weight. Some have more. Some have less. You're going to have... Your dexamethorphan is going to constantly change. And so the only way to determine and to treat the patient is to know what that level is in the blood by controlling what goes in of dexamethorphan going into the blood regardless of that salt form. And a claim construction that ignores that intent of the inventors cannot be correct. But you know what the concentration is going to be. It's an easy calculation. The spec tells us how to calculate it. So if you want to put in a salt that has less dexamethorphan in it then so be it. If you want to pump up the amount of dexamethorphan that goes into the body you put a higher amount of the total salt. It's a pretty easy calculation. It's not as if you're fooling anybody and thinking how much dexamethorphan is going in. We need to provide a specific range of therapeutic treatment to a patient to treat that patient from a particular neurological disorder. That means that patient needs a specific dexamethorphan amount in that blood. Right. Right. Which you would know depending on whether you're using a salt or a free base form. You can easily determine what that amount is. We can't because we can't do so when there's so many potential variables. You could be doing compound... Essentially, what they're suggesting is the claim can be construed as dexamethorphan or it's salt. With all these different variations, some of them may infringe and some of them may not. That goes to your point, Your Honor. Yes, some of them may infringe and some of them may not. That makes the claim indefinite. If you can calculate with respect to any salt, any combination of these salts, exactly what the ratio is going to be, then you know whether for that particular treatment you infringe or not. That seems to me pretty straightforward. But in doing so, because there are so many variables and the number of potential forms that can be used, there are no limits. If we go back to Smith or any other references, you're looking at, again, no one had looked at it in the sense of are we looking at it in the context of Smith, in the context of salt or compound. It was purely a compound-based comparison. The prosecution history completely confirms that interpretation,  Their construction is incorrect. In fact, if it is, if you do adopt their construction, it would render that claim indefinite. And so, in that situation, we would not be infringing,  Now, one last comment. I think we're out of time. Thank you. I thank both counsel for the case that's submitted. Thank you. All rise. Now, before we get started, I would like to remind you that this hearing is being recorded.